rsiUNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

PETER LAWRENCE, M.D.,

                    Plaintiff,             06 Civ. 3580

   -against-                        <u>OPINION</u>

NYACK EMERGENCY PHYSICIANS, P.C.,
DR. IRA MEHLMAN, As Aider and
Abettor,

                   Defendants.

------------------------------------X

A P P E A R A N C E S :

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9|23|09

           <u>Attorneys for Plaintiffs</u>

           SUSSMAN & WATKINS
           40 Park Place
           P.O. Box 1005
           Goshen, New York  10924
           By:  Michael H. Sussman, Esq.


           <u>Attorneys for Defendants</u>

           KEANE & BEANE, P.C.
           445 Hamilton Avenue, 15th Floor
           White Plains, New York  10601
           By:  Edward F. Beane, Esq.
                Donna E. Frosco, Esq.

**Sweet, D.J.**

Defendants Nyack Emergency Physicians, P.C. ("NEP"), Dr. Ira Mehlman ("Dr. Mehlman") (collectively, the "Defendants") have moved pursuant to Rule 56, Fed. R. Civ. P., to dismiss the discrimination complaint of plaintiff Dr. Peter Lawrence ("Dr. Lawrence" or the "Plaintiff"). Upon the facts and conclusions set forth below, the motion is granted, and the complaint dismissed.

The unjustified letter of reprimand issued by Dr. Mehlman does not constitute a racially motivated adverse employment action under the unfortunate circumstances revealed by the consolidated factual statements of the parties.

## I.   BACKGROUND

### A.   Prior Proceedings

The complaint in this action was filed by Dr. Lawrence on May 11, 2006.   It alleged claims of race discrimination under 42 U.S.C. § 1981(a) and Title VII of

1

the Civil Rights Act of 1964 (as amended), as well as under
the New York State Executive Law Section 296.

Discovery proceeded and the submission of
materials relating to the instant motion was completed on
February 21, 2008.  The action was reassigned to this Court
on June 5, 2009.

B.    **The Facts**

The facts are set forth in the Defendants'
Statement of Undisputed Facts Pursuant to Local Rule 56.1
("Defendants' Statement"), the Plaintiff's Response to
Defendants' Statement of Undisputed Facts Pursuant to Local
Rule 56.1 and Counterstatement of Facts ("Plaintiff's
Response"), Defendants' Reply to Plaintiff's Response to
Defendants' Statement of Undisputed Facts Pursuant to Local
Rule 56.1 and Response to Plaintiff's Counterstatement of
Facts ("Defendants' Reply"), and the accompanying
affidavits and declarations.  Despite the details thus set
forth and the parties' contentions with respect to
admissibility, the material facts are not in dispute except
as noted below.

2

NEP (formerly known as Nyack Principal's Group, Inc.) is a New York professional corporation that provided management and professional medical services for the Emergency Department (the "ED") at Nyack Hospital. In September or October, 2002, NEP was retained by Nyack Hospital to manage the ED and provide emergency medical services at the hospital. The contract between NEP and Nyack Hospital was eventually ended by mutual agreement at the initiative of NEP due to financial considerations.

Dr. Mehlman is a medical doctor licensed to practice medicine in the State of New York, was employed by NEP, and served as Director of the ED at Nyack Hospital. Dr. Mehlman is white.

Dr. Lawrence, an African-American, is a medical doctor and also has a law degree. He was employed by NEP as an emergency room physician. From the inception of its contract with Nyack Hospital in 2002 until the end of the contract on October 31, 2006, NEP employed Dr. Lawrence as a staff physician in the ED.

3

Dr. Joseph Degioanni ("Dr. Degioanni") is a medical doctor serving as President of NEP. He is board certified in Aerospace Medicine and Emergency Medicine.

During the events from which this lawsuit arises, David Freed ("Freed") served as Chief Executive Officer of Nyack Hospital. Dr. John Pellicone ("Dr. Pellicone") was Chief Medical Officer of the Nyack Hospital Medical Staff and oversaw quality control issues at the hospital, including management of the ED. Dr. Richard King ("Dr. King") was President of the Medical Executives of Nyack Hospital.

Upon assuming operations of the Nyack Hospital ED, NEP initially hired the majority of ED physicians then employed in the Nyack Hospital ED, including Dr. Lawrence. NEP also recruited an outside physician, Dr. Chachkes, to serve as the Director of the ED. Dr. Chachkes was subsequently terminated at the request of Freed.

Upon the departure of Dr. Chachkes, a search for a new permanent Director was undertaken, and Dr. Lawrence was appointed as Interim Director of the ED. Freed agreed to the appointment of Plaintiff as Interim Director. At

4

the request of Dr. King, Plaintiff also interviewed for the
permanent position of Director of the ED.

Although Dr. Degioanni did not make any
recommendations concerning who should be hired as the
permanent Director, he did inform Freed that Plaintiff "had
done a good job" in the ED.   Ex. V to Decl. in Supp. of
Defs.' Mot. for Summ. J. ("Beane Decl.") at 39:23-40:21.
Dr. Degioanni presented a number of candidates, including
both Dr. Mehlman and Dr. Lawrence, to a selection committee
appointed by Nyack Hospital.   The decision as to whom NEP
should hire as the permanent Director of the ED was made by
the selection committee.

During his interview, Dr. Lawrence informed the
selection committee that he had come to the interview
because of his friendship with Dr. King and that "if the
hospital wants me to be the director, I would be glad to do
that, but my personal wish is that I don't want to do that
job."   Ex. 3 to Affirm. in Resp. to Defs.' Statement of
Undisputed Facts Pursuant to Local Rule 56.1 ("Sussman
Aff.") at 41:15-24.

Dr. Mehlman had not been employed previously at Nyack Hospital at the time he applied for the position of Director of the ED.

Following the interviews, Freed informed Dr. Degioanni of the committee's selection of Dr. Mehlman as the permanent Director of the Nyack ED, and NEP thereafter hired Dr. Mehlman as such.

Dr. Mehlman commenced his employment as Director of the Nyack ED in late autumn 2003. From the beginning of Dr. Mehlman's employment by NEP, his intention, which he communicated to NEP, was to stay at Nyack Hospital for only two to three years. Dr. Mehlman eventually served as Director of the ED until November 2005, at which time a new ED Director was identified and hired. Thereafter, Dr. Mehlman served as Associate Director through January 2006 and then as a staff physician from January 2006 until early November 2006.

Dr. Lawrence testified that Dr. Mehlman, as the Director of the ED, was his "boss" and had administrative responsibility for the ER, including the assignment of shifts to the ED staff physicians. Sussman Aff. Ex. 3 at

6

216:2.  In assigning shifts, Dr. Mehlman solicited from the
ED staff physicians their preferences concerning shifts and
generated a matrix to be completed by each ED physician
concerning his or her preferences for (a) number of shifts
and (b) times of shifts.

Dr. Lawrence routinely requested to work only day
shifts and no Sundays.   During  Dr. Mehlman's  tenure  as
Director of the ED, Dr. Lawrence was the only doctor who
requested that he not be assigned night shifts or any
shifts  on  Sundays.    According  to  Dr.  Mehlman,  Dr.
Lawrence's  requests  were  incompatible  with  staffing
requirements for the ED and unfair to the other staff
physicians.  However, Dr. Lawrence was not the only staff
physician who did not have all of his or her requests
concerning shifts granted.

Dr.  Mehlman  did  not  assign  six  shifts  in
consecutive  days  to  the  same  staff  physician  if  such
scheduling could be avoided, as each shift is 12 hours and
such an assignment could raise safety issues.  On occasion,
however,  Dr.  Mehlman  did  assign  Dr.  Lawrence  to  six
consecutive shifts.

According to Dr. Mehlman, prior to the incident that occurred in the evening of May 26, 2005, from which this lawsuit originates (the "May 26 Incident"), Dr. Lawrence never complained about the assignment of shifts, a contention denied by Dr. Lawrence.

Doctors employed by NEP in the Nyack ED typically worked 13 to 18 shifts per month.   According to Dr. Lawrence, Dr. Mehlman reduced his shifts per month from 17-23 to 8-11.   However, Dr. Lawrence never submitted written complaints of any kind to Dr. Mehlman's superiors at NEP concerning scheduling issues.

After Dr. Mehlman stepped down as Director of the ED, Dr. Lawrence requested fewer shifts because he was also employed in the emergency department of another hospital. According to Dr. Lawrence, he worked in the emergency rooms of both Phelps Memorial Hospital and Passcack Valley Hospital while employed at Nyack Hospital due to the reduction in the number of shifts to which he was assigned at Nyack Hospital.

Dr. Lawrence also recognized that in addition to his authority to assign shifts to staff physicians in the

ED, Dr. Mehlman possessed the authority to set policies for the ED with which Dr. Lawrence was required to comply.

During the time Dr. Mehlman was Director, there existed a policy concerning "linkage" between doctors and mid-level providers which was communicated to the ED staff. A mid-level provider is also known as a "physician extender," and is a physician assistant or nurse practitioner. As Director, Dr. Mehlman promulgated additional policies emphasizing this "linkage" requirement. Dr. Lawrence has testified that he was aware of the various policies concerning mid-level providers/physician assistants issued by NEP prior to May 26, 2005.

Dr. Lawrence has alleged that during his time as Director, Dr. Mehlman made several racially offensive statements, including "My father did a lot for Black people;" "I ran into John Coltrane's nephew this weekend;" "We've got good doctors here – we have Dr. Lawrence, the good-looking black guy that can dance, and Dr. Rymond, who went to Harvard;" "Dr. Lawrence works on Jamaican time. Screw Jamaican time." Pl.'s Aff. in Resp. to Defs.' Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Lawrence Aff.") ¶ 24. Dr. Mehlman has denied making

9

these statements. Dr. Lawrence, however, never asked Dr. Mehlman to refrain from making these comments prior to the May 26 Incident, although Dr. Lawrence has contended that he told Dr. Degioanni in June 2004 about his belief that Dr. Mehlman harbored racial animus towards him. Dr. Lawrence also testified that he informed Dr. King of his belief that Dr. Mehlman was discriminating against him on the basis of race.

Dr. Degioanni testified that he was not aware of any conflict between Dr. Lawrence and Dr. Mehlman prior to the May 26 Incident. Dr. Degioanni also does not recall any complaints by Dr. Lawrence or any other physician in the ED concerning Dr. Mehlman's conduct prior to May 2005. Dr. Lawrence, however, has contended that in addition to his complaints to Dr. Degioanni, other doctors complained in meetings about Dr. Mehlman's unresponsiveness to their concerns about the operations of the ED.

As admitted by Dr. Lawrence, the Complaint was incorrect when it asserts that Plaintiff was the only African-American employed by NEP in the Nyack Hospital ED. In fact, Dr. Sam Jones ("Dr. Jones") was an African-American physician employed in the ED on the date of the

10

Complaint.   Dr. Augustine Alifo was another African-American physician offered employment in the ED as Assistant Director during the time Dr. Lawrence was employed by NEP.  Dr. Deborah White, an African-American woman, also was offered employment in the ED during Plaintiff's employment with NEP.

## The May 26, 2005 Incident

On the evening of May 26, 2005, an incident occurred in the Nyack Hospital ED involving a patient who had suffered a miscarriage.  Dr. Lawrence was a physician on duty that day in the ED from 12:00 noon to 12:00 a.m.  Another physician, Dr. Mark Khilnani ("Dr. Khilnani") was a physician on duty in the ED from 7:00 p.m. to 7:00 a.m. the next morning.  Dr. Khilnani, a recent medical school graduate, was less experienced than Dr. Lawrence and is not African-American.  Dr. Mehlman was not working in the ED on the evening of May 26, 2005.

In a statement dated June 16, 2005, Dr. Lawrence stated that he was notified at 6:35 pm that the patient had arrived in the ED.  During his deposition, however, Dr. Lawrence contended the notification was after 7 p.m.  After

11

being notified of the patient's arrival, Dr. Lawrence
advised Chris Genovese ("Genovese"), the nurse who informed
him of the presence of the patient, to contact a mid-wife
from the Obstetrics Department and to place the patient's
chart on the board to be seen by the next available
physician.  According to Dr. Lawrence, Genovese stated that
the patient did not need to be seen immediately.   Dr.
Lawrence also asserts that there was no requirement that a
patient be seen by a particular ED physician.

The patient remained in the ED during the
remainder of Dr. Lawrence's shift.  The patient's emotional
state apparently degraded during the time she was in the
emergency room, resulting in her call to the police
alleging that she had been assaulted in the ED.   In
response, a police officer was dispatched to the Nyack
Hospital ED.

At the time of the police officer's arrival in
the ED, Dr. Lawrence was the ED physician on duty with the
most seniority.   According to Dr. Lawrence, he was busy
caring for patients when the officer arrived in the ED, and
Dr. Khilnani was physically closer to the officer.   Dr.
Lawrence testified that he eventually approached the

12

officer, who had not asked for assistance, and inquired
into the purpose of his presence.   In response, Dr.
Lawrence received what he characterized as a "vague" answer
that did not identify the patient as the reason for the
police presence.  Lawrence Aff. ¶ 5.  However, the officer
did state that he had received a call to come to the ED and
asked Dr. Lawrence to speak with "someone in charge."
Beane Decl. Ex. U at 108:15-18.  Dr. Lawrence referred the
officer to Genovese and told her to let him know if he or
the attending physician could do anything to help.  Dr.
Lawrence did not see the patient during the remainder of
his shift.

Although the patient was seen by a mid-wife from
the Obstetrics Department, as directed by Plaintiff, as
well as a physician's assistant, no ED physician interacted
with the patient until the early morning hours of May 27,
2005.

On May 27, 2005, Dr. Degioanni learned of the
previous evening's incident in the ED via a phone call from
Freed.  Dr. Mehlman was first informed of the May 26
Incident by Freed as well.  On May 27, 2005, Freed removed
the Dr. Mehlman from his clinical duties to confront him

13

about the incident.   This interruption of clinical duties was a unique event.   During the conversation, Freed specifically identified Dr. Lawrence as someone involved in the May 26 Incident.   Dr. Mehlman informed Freed that he had not been present in the ED during the previous evening, that he did not know why Plaintiff had not seen the patient in question, but did note that, although it was important for the patient to be seen for humanistic and other reasons, the patient may not have presented a medical emergency and Dr. Lawrence may have been busy with more critical patients.

Dr. Mehlman admitted that, after being informed of the May 26 Incident, he must have spoken with Jessica O'Brien ("O'Brien") at some point about her report of the incident, but could not recall any part of that conversation.   Dr. Mehlman could not recollect speaking with the midwife on the case or with the obstetrician on call that night, Dr. Nicholas Klein, who supervised the midwife attending to the patient.

Following his discussion with Freed, Dr. Mehlman sent an e-mail to Dr. Lawrence on May 27, 2005, seeking information concerning the events of the previous evening

14

and stating though there had not been a medical emergency there was a "humanistic, social, litigious and administrative emergency." Sussman Aff. Ex. 1. On May 28, 2005, Dr. Mehlman again e-mailed Dr. Lawrence concerning the events of the evening of May 26, 2005, to convey his concern that Dr. Lawrence did not understand the severity of the situation. Dr. Lawrence considered Dr. Mehlman's May 27, 2005 e-mail to constitute criticism of his actions. The Complaint did not allege that Dr. Mehlman blamed Dr. Lawrence for any prior problems in prior cases.

According to Dr. Lawrence, he responded to both of Dr. Mehlman's e-mails in a May 29, 2005 e-mail in which he referred to recommendations he had made for managing the ED and suggested that Dr. Mehlman contact Genovese or Dr. Khilnani. Whether or not this e-mail was responsive to Dr. Mehlman's e-mails is an issue of fact. However, it is undisputed that Dr. Lawrence never spoke with Dr. Mehlman about the May 26 Incident.

Dr. Lawrence forwarded the e-mails to other individuals, thereby disclosing their contents, and discussed the May 26 Incident and e-mails from Dr. Mehlman

15

with other members of the group in addition to NEP and Nyack Hospital personnel.

Dr. Lawrence also posted a document in the ED which presented two questions to the staff of the ED concerning the May 26 Incident:

RE: CUSTOM AND PRACTICE IN NYACKS PRINCIPALS GROUP

FACTS: On May 26, 2005, at around 18:35PM, Assistant Nurse Manager, Chris Genovese RN, informed me of a patient, M.P., that may have miscarried. I responded that I could not see this patient because I was currently managing five (5) active cases. I asked and was told that the patient was stable. I then told her to put the patient in the Gyn room, call the OB midwife, and put the patient up "next" to be seen, by the "next" available provider.

The OB midwife saw the patient promptly. PA Jessica O'Brien, a MLP, saw the patient when she came on shift. Dr. Khilnani was the 7P-7A doctor and Nathaniel Silverberg MD, was going off as the 7A-7P doctor. I was on the 2P-12MN shift.

P.A. Jessica O'Brien did not endorse the case to me. I was never asked to see the patient. Assistant Nurse Manager Chris Genovese never asked me to get involved in any issues involving the case.

QUESTION: On the basis of these undisputed facts.

1) Under current and existing custom and practice patterns, was Dr. Lawrence physician of record and the responsible physician for this patient on the facts stated? Please sign in the

16

space below and answer 'Yes' or 'No' beside your
signature.

2)   Are you aware of any rules or regulations in
existence at the time that would require Dr.
Lawrence to be the responsible physician, or the
physician of record, in this case, given the same
set of facts?  Please sign in the space below and
answer "yes" or "no" beside your signature.

Lawrence Aff. Ex. 1.   Eleven individuals, including eight

doctors, signed "No" beneath each question.   No doctor

signed 'Yes'.   All the emergency room doctors except Dr.

Mehlman signed "No".


On June 8, 2005, Dr. Lawrence wrote to the Chief

of the Medical Staff, Dr. Howard Feldfogel ("Dr.

Feldfogel") accusing Dr. Mehlman of orchestrating the facts

in a manner negative to him and harboring racial animosity

towards him.   Dr. Lawrence also requested the convening of

an emergency peer review of the relevant patient.

According to Dr. Lawrence, the Director and Assistant

Director of Peer Review, Dr. Clement Osei ("Dr. Osei") and

Dr. Arthur Kozin ("Dr. Kozin"), respectively, and Dr.

Lawrence appeared, as scheduled, for peer review.   Freed

then arrived and stated that peer review was cancelled,

that the problem was solved, and there was no need for peer

17

review.   At no time did Dr. Degioanni request peer review
of the May 26 Incident.

During his employment with NEP, Dr. Lawrence was
aware that Nyack Hospital officials had direct say in the
manner in which he performed his job, and if he did
something that displeased the hospital management, such
displeasure would be communicated to him either directly or
through the ED Director.   Such situations arose with other
NEP physicians, not only Dr. Lawrence.   In those instances,
Dr. Mehlman would issue, after prior review, a letter
concerning deficiencies in the employee's conduct to be
included in the employee's file.   Dr. Degioanni had also,
on occasion, issued letters to other ED staff physicians
which were not enforced, such as a letter of termination.

Following the May 26 Incident, Freed directed Dr.
Mehlman to issue a written reprimand to Plaintiff.   Dr.
Mehlman issued a letter of reprimand to Plaintiff dated
June 9, 2005 (the "June 9 Letter").   According to Dr.
Mehlman, it was "unfathomable" that the senior doctor in
the department would not become involved when a situation
had deteriorated to the point of police involvement but
would instead take the police officer to a nurse manager.

Beane Decl. Ex. E.   Dr. Degioanni agreed with the reprimand because of Dr. Lawrence's refusal to admit that he had any amount of responsibility whatsoever for the May 26 Incident.

Dr. Mehlman did not reprimand any of the other physicians on the same shift as Dr. Lawrence.

The June 9 Letter had no impact on Plaintiff's compensation, benefits, privileges or responsibilities as a staff physician in the Nyack Hospital ED although, according to Dr. Lawrence, he continued to receive fewer shifts thereafter.

Dr. Lawrence testified that his objection to the June 9 Letter is not that it was issued only to him, rather than to both him and Dr. Khilnani, but that he was criticized and assigned any responsibility for a situation in which he was not involved.   Dr. Lawrence testified that he would have the same objection to the June 9 Letter if it had also been issued to the other doctors on duty the evening of May 26, 2005.

19

The June 9 Letter was subsequently rescinded by Dr. Pellicone following the receipt of additional information from other staff members at the ED, and no such letter is now contained in the files of Nyack Hospital.

On July 6, 2005, Dr. Degioanni wrote, in a letter to Dr. Lawrence regarding the May 26 Incident (the "July 6 Letter"): "As an ED doctor, you must be involved in patient issues as soon as possible and proactively.  As an ED doctor, it is your responsibility to be aware of the medical, administrative and humanistic needs of the patients at all times."  Beane Decl. Exh. F.  The letter went on to state, "I need to know that on a going forward basis you are wiling and able to abide by Dr. Mehlman's instructions, and that you are willing and able to follow standard of care procedures expected of an ED doctor as discussed in this letter."  Id.  The letter also requested that Dr. Lawrence agree to the terms of the letter by signing it, which Dr. Lawrence refused to do.

Dr. Degioanni issued the July 6 Letter because he felt Dr. Lawrence was unwilling to be responsive to the concerns of NEP and Nyack Hospital and took neither criticism nor input well.  Dr. Degioanni did not send a

20

similar letter to any other doctor present in the ED during the evening of May 26, 2005.

Following communications by Dr. Lawrence with Freed and Dr. Pellicone, the July 6, 2005 letter written by Dr. Degioanni to Dr. Lawrence was never enforced or otherwise acted upon.   NEP did not pursue requiring Dr. Lawrence to sign the letter and did not discipline Dr. Lawrence in any manner for his failure to sign except, according to Dr. Lawrence, to continue the reduction in his shifts.

On July 25, 2005, Dr. Khilnani wrote in a letter to Dr. Mehlman, "I don't feel that Dr. Lawrence should be held accountable for any deleterious actions that may have occurred from the treatment and disposition of the infamous, landmark gyn-pa case. I am not shocked that you believed that Dr. Lawrence was responsible for the case, as you were not present that night, you were not feeling the pulse of the emergency room and the severity of the cases that Dr. Lawrence and myself were handling, and perhaps you did not have complete information at your disposal when you formed your opinion."   Lawrence Aff. Ex. 6.

21

Prior to filing the Complaint, Dr. Lawrence timely filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC"). The Defendants denied the claims set forth in the EEOC complaint and the complaint was dismissed via a Dismissal and Notice of Right to Sue letter issued by the EEOC on or about February 24, 2006.

## II.  DISCUSSION

### A.    The Applicable Standards

#### 1.    Summary Judgment

Summary judgment is granted only where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); SCS Commc'ns, Inc. v. Herrick Co., 360 F.3d 329, 338 (2d Cir. 2004). The courts do not try issues of fact on a motion for summary judgment, but, rather, determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of

law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-
52 (1986).

"The party seeking summary judgment bears the
burden of establishing that no genuine issue of material
fact exists and that the undisputed facts establish [its]
right to judgment as a matter of law." Rodriguez v. City
of New York, 72 F.3d 1051, 1060-61 (2d Cir. 1995).  In
determining whether a genuine issue of material fact
exists, a court must resolve all ambiguities and draw all
reasonable inferences against the moving party.  See
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.
574, 587 (1986); Gibbs-Alfano v. Burton, 281 F.3d 12, 18
(2d Cir. 2002).  However, "the non-moving party may not
rely simply on conclusory allegations or speculation to
avoid summary judgment, but instead must offer evidence to
show that its version of the events is not wholly
fanciful." Morris v. Lindau, 196 F.3d 102, 109 (2d Cir.
1999) (internal quotes omitted); Fletcher v. Atex, Inc., 68
F.3d 1451, 1456 (2d Cir. 1995) ("Finally, mere conclusory
allegations or denials in legal memoranda or oral argument
are not evidence and cannot create a genuine issue of fact
where none would otherwise exist." (internal quotes and
citation omitted)).  Summary judgment is appropriate where

23

the moving party has shown that "little or no evidence may
be found in support of the nonmoving party's case.  When no
rational jury could find in favor of the nonmoving party
because the evidence to support its case is so slight,
there is no genuine issue of material fact and a grant of
summary judgment is proper." Gallo v. Prudential
Residential Servs., L.P., 22 F.3d 1219, 1223-24 (2d Cir.
1994) (citations omitted).

Where a claim involves a subjective component,
such as racially discriminatory intent, "there must be
solid circumstantial evidence to prove plaintiff's case" in
order to establish a material issue of fact.  Verri v.
Nanna, 972 F. Supp. 773, 783 (S.D.N.Y. 1997).

## 2.   Title VII Claims

"Title VII's core substantive anti-discrimination
provision makes it an unlawful employment practice . . . to
discriminate against any individual with respect to the
compensation, terms, conditions, or privileges of
employment, because of such individual's race, color,
religion, sex or national origin . . . ." Kessler v.
Westchester County Dep't of Social Servs., 461 F.3d 199,

24

206 (2d Cir. 2006) (citing 42 U.S.C. § 2000e-2(a)).   The
Supreme Court has outlined a three step, burden-shifting
analysis for race discrimination claims brought under Title
VII.   The burden initially rests upon the plaintiff to
establish a prima facie case of discrimination.   McDonnell
Douglas Corp. v. Greene, 411 U.S. 792, 802-05 (1973); see
also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-08
(1993); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S.
248, 252-53 (1981).   Establishing a prima facie case of
discrimination requires the plaintiff demonstrate, by a
preponderance of admissible evidence, that (1) he is a
member of a protected class; (2) he satisfactorily
performed his job duties; (3) he suffered an adverse
employment action; and (4) the adverse employment action
occurred under circumstances giving rise to an inference of
discriminatory intent.   See Terry v. Ashcroft, 336 F.3d
128, 138 (2d Cir. 2003); see also Zahorik v. Cornell Univ.,
729 F.2d 85, 92 (2d Cir. 1984).   Where a plaintiff is
unsuccessful in satisfying these criteria by a
preponderance of the admissible evidence, summary judgment
is warranted and the case is dismissed.

     If a plaintiff successfully establishes a prima
facie case of discrimination, the burden of production

25

shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment decision. See St. Mary's Honor Ctr., 509 U.S. 506-07. If the employer articulates a legitimate reason for its employment actions and decisions, the presumption of discrimination triggered by the prima facie case drops from the analysis. The focus then turns to the plaintiff's ultimate burden of persuasion to demonstrate by a preponderance of the evidence that the challenged employment decision was the result of intentional discrimination. See id. at 509-11. Thus, the plaintiff must show that his race is a motivating factor in the employer's decision-making process and had a determinative influence on the outcome. Luciano v. Olsten Corp., 110 F.3d 210, 219 (2d Cir. 1997). It is at this point that the plaintiff may seek to establish that the defendant's stated justification for the adverse employment action is, in fact, a pretext for discrimination. Id. at 215. The plaintiff may not establish the existence of an issue of material fact concerning the pretextual nature of the justification "by offering purely conclusory allegations of discrimination, absent any concrete particulars . . . ." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).

In considering claims brought pursuant to 42 U.S.C. § 1981, the same analytical framework used in a Title VII discrimination claim is applied. Anderson v. Hertz Corp., 507 F. Supp. 2d 320, 326-27 (S.D.N.Y. 2007). Similarly, the law is well settled that "claims brought under the New York State's Human Rights Law [New York State Executive Law § 296] are analytically identical to claims brought under Title VII." Torres v. Pisano, 116 F.3d 625, 629 n.1 (2d Cir. 1997), cert. denied, 522 U.S. 997 (1997); Anderson, 507 F. Supp. 2d at 327.

### B.  Plaintiff Has Not Established a Prima Facie Case of Discrimination

#### 1.  Plaintiff Cannot Establish the Existence of an Adverse Employment Action

As the Second Circuit has noted, "not every unpleasant matter short of discharge or demotion creates a cause of action" for discrimination. Richardson v. N.Y. State Dep't of Corr. Servs., 180 F.3d 426, 446 (2d Cir. 1999), abrogated on other grounds by Kessler, 461 F.3d 199. Rather, an "adverse employment action" must amount to

> a materially adverse change in the terms and conditions of employment. To be "materially

27

adverse," a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Such a change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to the particular situation.

Savarese v. William Penn Life Ins. Co. of N.Y., 418 F. Supp. 2d 158, 161 (E.D.N.Y. 2006) (quoting Weeks v. N.Y. State (Div. of Parole), 273 F.3d 76, 85 (2d Cir. 2001), abrogated on other grounds by Nat'l R.R. Corp. v. Morgan, 536 U.S. 101 (2002)); see also Mormal v. Costco Wholesale Corp., 364 F.3d 54, 57 (2d Cir. 2004) ("A tangible employment action, as defined by the Supreme Court, 'constitutes a significant change in employment status, such as hiring, firing, failure to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" (citation omitted)). An employment action is not materially adverse for purposes of a Title VII discrimination claim simply because a plaintiff is unhappy about it or believes it is unfair or unwarranted. Garber v. New York City Police Dep't, No. 95 Civ. 2516 (JFK), 1997 WL 525396, at *5 (S.D.N.Y. Aug. 22, 1997) (holding plaintiff's purely subjective feelings about an employment

28

transfer did not rise to level of Constitutional violation), aff'd, 159 F.3d 1346 (2d Cir. 1998).

Plaintiff's allegations concerning materially adverse changes in the terms and conditions of his employment stem from the June 9 Letter to Dr. Lawrence reprimanding him for his actions during the evening of May 26, 2005. According to Dr. Lawrence, the memo resulted in the ED atmosphere becoming "poisoned against him" and "justified the shorting" of the number of shifts assigned to him. Plaintiff's Response ¶ 109.

However, these allegations, in light of the evidence offered by Dr. Lawrence, are insufficient to establish an adverse employment action under Title VII. With regard to Dr. Lawrence's allegations that the ED atmosphere was "poisoned" against him, it was he, not Defendants, who publicized his communications with Defendants concerning the May 26 Incident and the June 9 Letter to a number of physicians and other ED medical staff while attempting to garner support for his claim that he did nothing wrong. Therefore, Dr. Lawrence's own actions served as the proximate cause of any effect the June 9 Letter might have on the atmosphere of the ED. In

29

contrast, Plaintiff offers no evidence that Defendants engaged in any activity to publicize the May 26 Incident among the ED employees, and Defendants cannot be held responsible for any alleged "poisoning" of the ED atmosphere.

Plaintiff's allegation concerning "shorting" of his shifts also fails to establish the existence of an adverse employment action. Dr. Lawrence has acknowledged that the "shorting of his shifts" preexisted the May 26 Incident and the June 9 Letter. Moreover, Plaintiff has not produced any evidence that this practice became more severe following either the May 26 Incident or the June 9 Letter. Dr. Lawrence also admits that he was working in the emergency departments of two other hospitals during this period and requested fewer shifts at the Nyack Hospital ED to enable him to continue to do so.

Dr. Lawrence was not demoted, discharged, disciplined in any way, transferred, or assigned different or lesser duties as a result of the June 9 Letter. His job title was not altered in any way and no other material changes to the terms and conditions of his employment were imposed as a result of or in conjunction with the June 9

30

Letter.   Because Plaintiff cannot, as a matter of law,
establish the existence of an adverse employment action,
his claim cannot withstand Defendants' motion for summary
judgment.


> **2.   Plaintiff Cannot Establish the Existence of
>         Discriminatory Intent**


Plaintiff also asserts that the actions taken by
Dr. Mehlman following the May 26 Incident were motivated by
discriminatory intent.   A plaintiff may establish that an
adverse employment action resulted from discrimination by
demonstrating that the employer treated him less favorably
than a similarly situated employee outside his protected
group.  Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d
Cir. 2003).   However, the "similarly situated" individual
must be "similarly situated in all material respects."
Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d
Cir. 1999) (quoting Shumway v. United Parcel Serv., Inc.,
118 F.3d 60, 64 (2d Cir. 1997)).   This requires
demonstrating that the plaintiff's fellow employee was
"subject to the same standards governing performance
evaluation and discipline, and must have engaged in conduct

31

similar to the plaintiff's." Id. at 96 (quoting Mazzella v. RCA Global Commc'ns, Inc., 642 F. Supp. 1531, 1547 (S.D.N.Y. 1986), aff'd 814 F.2d 653 (2d Cir. 1987)).

Plaintiff points to the absence of any action by Nyack Hospital against Dr. Khilnani following the May 26 Incident as evidence of disparate treatment. Dr. Khilnani, however, cannot said to be a "similarly situated" employee. While Dr. Khilnani was also on duty the night of May 26, 2005, he was not the physician who spoke with the police officer in the ED. In addition, while Dr. Khilnani was a recent medical school graduate, Plaintiff was the doctor on duty with the most seniority and the former Interim Director of the ED. Further, Defendants had not been directed by the CEO of Nyack Hospital to issue a reprimand to Dr. Khilnani. Because Plaintiff has not proffered any additional evidence that he was treated less favorably than similarly situated individuals, he cannot rely on allegations of "disparate treatment" to demonstrate discriminatory intent on the part of Defendants.

In further support of his assertion of discriminatory intent, Dr. Lawrence cites to comments allegedly made by Dr. Mehlman, described supra, that he

argues evidences racial bias. In considering the nature of allegedly racially discriminatory conduct, courts have warned that "[i]n Title VII actions . . . it is important to distinguish between harassment and discriminatory harassment in order to 'ensure that Title VII does not become a general civility code.'" Manessis v. N.Y.C. Dep't of Transp., No. 02 Civ. 359 (SAS), 2003 WL 289969, at *7 (S.D.N.Y. Feb. 10, 2003) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)); Petrosino v. Bell Atl., 385 F.3d 210, 223 (2d Cir. 2004) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)). Thus, offhand comments or isolated incidents of offensive conduct, unless extremely serious, will not support a claim of discriminatory harassment, even if the plaintiff can submit admissible evidence that they in fact occurred. Petrosino, 385 F.3d at 223; Holtz v. Rockefeller & Co., 258 F.3d 62, 75 (2d Cir. 2001).

Even viewing Dr. Mehlman's comments in a light most favorable to Plaintiff, no trier of fact could conclude that a reasonable person would find the comments, unconnected by time or date to the alleged adverse employment action, sufficient to support a claim of racial discrimination. Indeed, Dr. Lawrence himself never

33

complained to Dr. Mehlman about his (Dr. Mehlman's) statements prior to the initiation of this lawsuit or requested that Dr. Mehlman stop engaging in the conduct which Plaintiff now claims was offensive and objectionable.

As to the allegations that Dr. Mehlman's scheduling decisions evidences his racial animus, Plaintiff admits that the same or similar scheduling practices were continued by a new Director hired in November 2005 by NEP. Despite this, Plaintiff does not allege any racially discriminatory motivation on the part of the new Director.

Plaintiff's allegations of racial discrimination are further undercut by the fact that NEP appointed Dr. Lawrence as the Interim Director of the ED in 2003 and considered Dr. Lawrence for the position of permanent Director of the ED. Dr. Lawrence was also presented as a candidate to the Nyack Hospital committee charged with choosing the new Director. In addition, Dr. Mehlman himself recruited an African-American physician for the position of Assistant Director of the ED, and two African-American physicians, Dr. Deborah White and Dr. Augustine Alifo, were offered employment with NEP as the future Director of the ED during Dr. Mehlman's tenure as Director.

34

Plaintiff's perceived slights by Dr. Mehlman and his present objections to Dr. Mehlman's conduct and comments do not establish discriminatory intent on the part of Defendants.  Such perceived slights, or even personality conflicts, are insufficient to support an allegation of discriminatory intent.

## IV.   CONCLUSION

Upon the facts and conclusions stated above, the motion for summary judgment is granted and the Complaint is dismissed.  Enter judgment on notice.

It is so ordered.

**New York, NY**
**September  27 , 2009**

ROBERT W. SWEET
U.S.D.J.

35